Hello and may it please the court, I'm James Laughlin and I represent the appellant Peter Lam. With the court's permission, I'd like to reserve four minutes of my time for rebuttal. This case raises several issues, but this morning I'd like to focus first on the sentencing issues and then turn to the venue. I choose to discuss the sentence first because in an obvious error the government refuses to concede. Defense level in this case was established by just one factor. The tax loss resulting by multiplying the value of the relevant fish products times the applicable tax rate. Both numbers were disputed, but what's most significant is the probation office's calculation for the value of fish products relevant to Mr. Lam's sentencing. That was around $13.6 million. The government didn't object to that calculation, but Mr. Lam argued for a lower number. Unfortunately, shortly before the sentencing, the probation office filed an amended pre-sentence report and an addendum that slightly changed a different number. Counsel, excuse me, the combination of talking fast and softly, it makes it tough to hear. I apologize. Thank you, that's much better. A little slower too. Okay, unfortunately, shortly before the sentencing, the probation office filed an addendum and amended pre-sentence report that slightly changed a different number. The value of fish products sold during the entire course of Henry Wend's conspiracy, including a significant period of time before Mr. Lam was hired. Slow down. Okay, I'm sorry. That figure went from about $15.5 million to $15.7 million. As a result, the court became confused and fixated on that $15.7 million figure, even though it's undisputed that Mr. Lam should have been sentenced using no more than the $13.6 million. What do you mean it's undisputed? The government agrees that $13.6 was the standard that should have been used? Yes, at page 58 of their brief, they conceded that. They conceded that. All right. And what follows from that, that this must be remanded for recalculation and resentencing? Yes, because given that lower figure, the tax rate made all the difference. That would have reduced it to an offense level 24? Yes. Okay. Because the court, the only finding made by the court with regard to the tax rate, I know the government says it's not really a finding, but what the judge said was I think I come to agree with your position on the tax rate to Mr. Lam. So that lower tax rate, about 46 percent applied to the 13.6 figure, comes in under $7 million, which is a threshold between 24 and 26. That two-level difference results in a one-year difference in the applicable guideline range. So it's a very significant factor coming down to this one thing. And I think that if the court looks at the relevant 12 pages of the sentencing transcript, which are excerpt pages 20 through 32, the court should really conclude that this was just a mistake. It happens from time to time. The court fixated on the wrong number and made a mistake on that basis. There is no indication in the record to suggest that the court wanted to abandon, without saying, giving any reason why, the recommendations made by the probation office and the government to go to a higher figure that nobody was arguing for. And contrary to what the government says when it says that this transcript is not exactly clear whether the court adopted the lower tax rate, we think it is clear. But, and that's a factual finding that can only be reviewed for clear error, and there is no clear error here. Because even under the government's theory, the whole scheme was meant to avoid the 46% tax rate. But beside that, even if the government's right that the transcript's unclear, that just basically concedes a different kind of procedural error. The district court had the obligation to make essential factual findings. And clearly in this case, given the figure that's undisputed about what fish value products related to the sentencing were, 13.6 million, the tax rate made a difference. So he had to make a finding, a factual finding about that. And as a separate procedural error, he had to clearly explain that on the record sufficient for this court to do meaningful appellate review. And we have neither of those. But whichever way you look at this, whether the court just made a mistake and looked at one number, whether, as the government said, maybe he decided to, you know, use the higher tax rate, there's just not enough of this court to sustain the sentence. And that, for that mistake alone, I think this court can and should resentence based solely on that. If it does so, the court doesn't have to reach Mr. Lamb's other sentencing issues. I'd nevertheless like to briefly discuss two other problems with the sentence. First, Mr. Lamb is the only. That last sentence completely threw me off. What did you mean? Oh. If we accept the two-level reduction. Yes. Then we don't have to do anything else? Well, because you'd be sending it back for an open resentencing. Or we could. Okay. Go ahead. Well, typically the court sends under Matthew sends things back for an open resentencing. Or impose a, send it back to impose a sentence. We can do that. That would be a very unusual step based on the way the courts have handled this in the past. So you're saying if we find that, then we can just send it back and the trial judge can do what is appropriate? Right. Because with an open resentencing, these other issues will be in play again, and therefore, unless the court feels they need to offer some kind of advisory decision, it's not realistic.  Go ahead. In any event, just in case the government continues to argue against what I think is the clear error, I want to just briefly touch on two of the other sentencing points. One is Mr. Lamb is the only stable parent to his young son, Richard, which I think is a significant factor requiring a sentence below the advisory range. And then second, the straight guideline sentence imposed by the district court fails to take into account Mr. Lamb's purported role in the offense. The government star witness, Theresa Long, established that Henry Wynn was the creator and driving force behind the scheme and that everybody who worked for him were his pawns. Now, even if Mr. Lamb did allow himself to be knowingly used in this manner, he was still a pawn. He's uneducated, unsophisticated, has a working class background, and now that made him very ripe for Henry Wynn, who picked such people to put in his company and be left holding the bag when everything went wrong. Henry Wynn made millions of dollars. Mr. Lamb, for the period of several months he worked there, made a modest salary for what he did. But because Mr. Lamb allowed himself to be put in as a figurehead president, he was left to face the consequences when Henry Wynn took all the millions of dollars back to Vietnam and he and another salesman were kind of left holding the bag. But even the jury recognized that Mr. Lamb was not a full participant in the Henry Wynn scheme when it found him guilty of joining a conspiracy far narrower in scope than that alleged in the indictment. Under these circumstances, this court had to take this limited role into account by doing one or more things. It could have given a minor role adjustment. It could have found that a lesser amount of the tax loss was reasonably foreseeable to Lamb. It could have recognized the structural flaws in the guideline, the applicable guideline that based the entire offense level on this one tax loss figure and really didn't distinguish between players in the alleged conspiracy. Or it could otherwise have granted a variance under 3553A. The district court did none of these things. So in short, Mr. Lamb's unique parental responsibilities, his limited role in the defense, and the other factors discussed in the briefs established only that he significantly below the 63- to 78-month range called for by the guidelines, which was used as both the starting and the ending point by the district court, would be sufficient but not greater than necessary to meet the goals of sentencing. So I think that would be fair. Okay. You didn't say anything about the relative disparity in sentencing among the other conspirators. True. I mean, like, there's many factors. You briefed that. I read that and looked at that, studied that. You didn't even say anything about it. It's a big brief, and even with 20 minutes, it's not a lot of time. So I focused on some things, but I would be happy to address that. Well, you still maintain that? Oh, of course. First of all, with limited time, I'm choosing to focus on certain issues, but I stand 100 percent behind everything. You were the trial attorney. Is that right? No, I wasn't. Okay. Somewhere in the record indicated that he tried to plead guilty, but then that didn't happen. Correct. How can you try to plead? I mean, if you want to plead guilty, can't you plead guilty? Well, what the record reflects was that there was an attempt to come to some kind of deal with the government. So, in other words, he didn't try to plead guilty. He tried to reach a deal, and it fell through. True. That's what I understand. But, I mean, it certainly reflects that this is not somebody who was totally, you know, who had no interest in accepting some kind of responsibility and come to a reasonable conclusion that would put this behind him. Okay. Regarding sentencing disparity, the government has a sentencing chart, which is referred to. I saw that. And many of the people who were sentenced were people who were purchasers of this. They weren't employees of Henry Wynn. They purchased the product and then sold it to their own customers, despite the mislabeling. All but one of those got probationary sentences. One defendant who had prior criminal history got a year and a day. Mr. Lamb's co-defendant at trial, Arthur Yabelberg. Keep in mind, the government put Mr. Yabelberg and Mr. Lamb side by side. They thought them indistinguishable. Henry Wynn made Peter Lamb the figurehead president of Virginia Star Seafood. He did the same thing with Henry Yabelberg with respect to another company. One of them was convicted of misdemeanor, the other of the felony. Right. Yeah, one was convicted, acquitted. Mr. Yabelberg was acquitted of everything except the lesser-included conspiracy, basically a conspiracy of distributing the fish without knowledge of the misbranding. And even the jury, as I said, with its findings regarding Mr. Lamb, found that his purported role in the offense was far, far narrower than the government had portrayed in the indictment. So the people who had actually been sentenced by Mr. Yabelberg got a very short probationary term as well. So the people who had been sentenced, Mr. Lamb's five-plus years looks far out of whack. On the flip side, Henry Wynn is still someplace in Vietnam or someplace else and may never come back. But it's worth noting that if he does come back, and even assuming he gets something like an upward roll adjustment, Mr. Lamb's sentence will be far too close to his if they both get convicted. Well, we don't know that. That's a complete speculation now. Well, I mean, it's speculation, but it's not. If he comes back and gets convicted, we know what the guideline range is because we know what the government's figures are for the number of the amount of fish product that's sold during this conspiracy. So there might be some slight adjustment that would... The guidelines now are advisory, so who knows what could happen to this guy. He's the big fish. He took off with all the money. I mean, he could really get knocked if they catch him. But you mean his guidelines... Right, right, right.  And to another point that was raised in the list of 35 to 38 factors, which is the structural problems of the guidelines in general and with this guideline in particular, which is that it's a very blunt instrument when it comes to these fraud offenses. Fraud includes all relevant conduct, so everybody in the scheme gets the same high fraud level. But within that scheme, you have people vastly different, like Henry Nguyen, who was the educated mastermind of the scheme, and somebody like Peter Lamb, who was uneducated, unsophisticated, and a palm. And so that was the discrepancy that I was trying to point out. Unless the Court has any more questions on sentencing, I'd like to move to a venue. What about the forfeiture? What was it, the... The forfeiture? Would the Court like me to address that first? Well, it seems like that was the next step. Okay, sure. The $12.6 million forfeiture judgment violates the Eighth Amendment's excessive fines clause because it's grossly disproportional to the gravity of Mr. Lamb's case. What do you think a fair figure would be? Well, under the test that was – that this Court adopted through the Bakajian case – I'm mutilating that, okay – it looks to the four factors, the nature, extent of the crime, whether the violation was related to other illegal activities, the other penalties that may be imposed for the violation, and the extent of the harm caused. I think the most significant of those, to answer your honest question, is the third factor, the other applicable penalties. And what this case – what this Court said in the U.S. currency case we cite in the brief is that what's most important is the fine range set by the guidelines because that's the one that really is – that the offense level is really supposed to take the defendant's conduct into account. Here, assuming for the moment that the 26 offense level is the correct one, as you say, we think it should be lower. But assuming that's correct, the fine range was 12,500 to 125,000. So basically, the forfeiture judgment is 1,000 times the low end of that range and 100 times the high end of that range. Now, the government has not pointed to any case upholding a forfeiture as constitutional where there's such a gross disparity between the discrepancy – gross discrepancy with the fine range. So, to answer your honest question, I think that something around that area would be far more – Between 12,500 and 125, is that what you're saying? Yes. Somewhere in that range? Yes. Okay. In fact, I think in the U.S. currency case where the Court set forth the factors, the Court found reasonable to be a forfeiture that was less than the title. Okay. Entire amount of forfeiture requested, but it was between the fine range. Right. And another point. That standing alone is enough to vacate the forfeiture order as unconstitutional. But the government never addresses a case we cite in our brief, which is United States v. Van Brocklin. And what Van Brocklin does is recognize that the forfeiture order has to be based on this particular defendant's conduct in the offense. And in that case, the Eighth Circuit found a $1.3 million forfeiture order to be constitutionally excessive as to the least culpable defendant in a bank fraud scheme who was a secondary figure in the crimes and reaped little benefit while others made millions. Now, that sounds a lot like the relationship Mr. Lamb had with Henry Nguyen. Mr. Lamb made a modest salary for several months while Henry Nguyen and his father took millions of dollars in profits from the scheme back to Vietnam. There's one other factor I think that's related to the gross proportionality test, and that's something that was recognized by the Court, I believe the Second Circuit, in the Levesque Court case. And in citing Backagean, it said, The Court has made clear that a forfeiture cannot be so great that it deprives a wrongdoer of his or her livelihood. That's what the $12.6 million judgment is going to do to Mr. Lamb. Given his age, his work history, and lack of education, it will be impossible for him to pay anything close to that amount, so it will forever interfere with his ability to support him and his son. So given that, on top of everything else, I think the Court should send this back to the Judicial Court to revisit this issue with whatever guidance it wants to provide to the Court. See, I'm a trial court judge sitting here by designation. I like it when they send it back, tell me what to do, and I can get on with the next case. That's just the way I am, but I don't know about these things. And I do think that the guidelines range, while it certainly is probably not absolute, it does provide the best guidance for what will be in the range of what's considered proportional. Turning back now to venue, unless the Court has any other questions on forfeiture. The key question is how to interpret the second paragraph of Section 545, the statute on which counts two through four base. You're really talking fast now. I'm sorry. The Supreme Court distinguishes between circumstance elements and essential conduct elements. Here, there are two elements at issue. First, the fish has been brought to the United States contrary to law, and second, that Mr. Lamb thereafter sold the fish knowing it had been brought to the United States contrary to law. There's no dispute that the second element is an essential conduct element, but that doesn't get the government where it wants to go, because for all the sales, Mr. Lamb was in Virginia, and his customers were elsewhere outside of the Central District of California. Where was the fish brought into the country? Mostly into the Port of Long Beach, but not all. Where was the paperwork filed with customers? Los Angeles. Isn't that enough? Not at all, Your Honor. Why? And here's why. Because, and this is where we get back to the difference between a circumstance element and a conduct element. In this particular provision in Section 545, the existence of the importation is purely a prior event that is a prerequisite to have happened before the actual conduct, which is the sale, takes place, much like the Supreme Court in Cabrales and Rodriguez and Reno looked at the money laundering statute. You have a prior condition that has to be met. There has to be illegal activity that results in proceeds. And then somebody takes those proceeds and does a financial transaction with them. And they said the act of doing the financial transaction is the essential conduct element. That's where venue has to happen. The fact that prior to that in another district, somebody did something illegal is besides the point. And I think we have the same thing here. The importation is not a conduct element with regard to this provision in effect. It's purely a prior circumstance. And I can prove that with one quick example. Under this section, somebody can be convicted even if they had nothing to do with the importation. If I illegally imported some product and I took it to the prosecutor here and I said, here, here's some illegally imported product. You might want to sell it to some people. If he then went out and sold it without any knowledge, he'd be guilty under Section – I mean, with that knowledge, he'd be guilty under Section 545. But he'd have nothing to do with my acts in another district actually importing the product. So that, to me, I think best highlights the fact that this is a statute where the only conduct at issue, the kind of conduct that under the Supreme Court's test can provide venue, is the actual sale after the importation. Your time has expired. Thank you very much, counsel. We'll hear from the governor. May I please report? My name is Sam Sankar. I'm here on behalf of the United States. Judge Reimer, please let me know if you can't hear me or if I'm talking too fast. So please speak slowly and keep your voice up. Will do. I'll start where the defense ended up with venue. Judge Trott, I think you're precisely right to focus on the fact that the fish, all the fish, I should say some of the fish for all of the substantive counts came through Los Angeles. Because the indictment itself charges the land with having received and sold the stuff after importation. It wasn't charged with importing or smuggling. That's entirely fair, Your Honor. I would point you in that case to Section 3237 of 18 U.S.C., which is the applicable venue statute for this. And 18 U.S.C. 3237 says that when you're charged with a crime that involves importation or the trafficking in goods, it is proper to bring venue in any of the locations from, through, or to where the goods traveled. And in that case, it's clear that Los Angeles was a point from which the goods came to the various customers that Mr. Land sold them to. So even if you take the defense's position that it's purely what's in the specific language of the indictment that matters and that we should ignore the fact that this was a larger crime that involved importation as a matter of the statute itself, the venue provision, 18 U.S.C. 3237, makes very plain that L.A. is a fair venue. One way of illustrating that is I would ask the defense whether they would concede whether Georgia, Illinois, and Texas are appropriate venues for these. These were the places to which the defendant sent the goods in question. It's undisputed, I think, that 18 U.S.C. 3237 would provide that those are appropriate venues. By contrast, I think it's very clear that L.A. being the place where the materials came in, the place where Mr. Land hired a custom agent, the place where he conceivably knew that some of this material was coming through, that place is a much more appropriate venue than some of these other very remote locations. It's also worth noting that none of these fish, as far as I can see from the trial record, were actually stored in Virginia itself. Virginia was purely a place where Mr. Land was sitting and talking on the telephone. By contrast, again, clear that for each of these crimes, the goods did move through L.A. Some of those goods did move through L.A. Next. On sentencing, the defense has suggested that there was a mistake made, first of all, in the sentencing colloquy that the judge made a simple error. Our position is a simple one. It's not clear. It's not abundantly clear from the record that the district court, in fact, did make a mistake. If it's not clear, how can we review it? And there's a year difference, isn't there? If it's not clear, shouldn't we send it back and say make it clear with a year in the balance? I mean, how can we review it if you agree it's not clear? It's not, I should say, it's not entirely clear. What is entirely clear? I mean, here we go into wiener-like definitions of clear. I've sent it to almost six people. I mean, you admit it. It's not clear, period. I'm not going to stand here and say that the judge made a clear finding in our favor. I will say that he did say the statement in question. I think what he said was, and I'll quote it exactly, I think ultimately I agree with your position with regard to duty rate. He then went on to a further sentencing colloquy and did the math. But you agree he may have made a mistake, and the mistake results in one year being tacked onto a sentence. I agree he may have made a mistake. So isn't the natural response for us as an appellate court to send it back and say clear it up? I don't think the government will be seeking cert if that's what you do. I don't think the SG would agree with that. I think that's a fair way to put it. Okay. With regard to the other elements of sentencing, one of the things I would point out is that the district court made several very specific findings about Mr. Lamb that relate to the sentence that he imposed. For example, the district court said Mr. Lamb, quote, knew exactly what the operation entailed. He said he had a view that went beyond the $2 or $3 million that he personally sold, and he, quote, engaged in sale after sale over a nine-month period. The district court judge specifically made these findings and wasn't simply applying the sentencing guidelines mechanically. He made specific findings based on his own view of the evidence presented that Mr. Lamb was not simply the pawn that the defense portrayed him to be. Was he a stock owner in this operation? Your Honor, he was. I should say the evidence showed that he was the person that owned the stock. Whether a purchase took place is something that the record actually doesn't know. There's paperwork showing that a purchase took place, but I don't think we put in evidence regarding whether money actually changed hands on that. Okay. It is clear, I find it interesting from the record, that Mr. Lamb did claim a fairly large tax write-off as a result of losses incurred by one of the corporations for which he was the president. The defense, again, would have us believe that this was a completely fictional ownership. In fact, Mr. Lamb did take advantage of at least that portion of the ownership privileges for his company. On the disparity point, again, the simplest way to explain the disparity is to say that Mr. Lamb did not take a plea. Your Honor has asked the question from the defense about why that didn't happen. My understanding from the trial attorneys is that Mr. Lamb was willing to plead guilty, but would not cooperate in any action against Mr. Nguyen, refused to cooperate on that, and that that was the reason why the government was not willing to accept a plea and a reduction for cooperation in that. So that's the explanation for that. If there's no further questions, Your Honor. Judge Reimer, any further questions? No, thank you. Thank you, counsel. You exceeded your time, but we'll give you one minute to respond. What about the tax write-off? Did he take a tax write-off? The PSR reflects that some of the corporate financials were reflected in some of his tax returns. I'll just echo what the government said. How about the venue? The statute seems to say that the venue was in Los Angeles. The statute that counsel quoted, 3237? That's what I wanted to address, the statute. I think the government puts too much in that. In fact, I would actually point to the Supreme Court's decision in Cabrales, the money laundering case, where the government made a similar broad interpretation argument. It's a 3237, and the court rejected it. And I think Cabrales in the decision the following year, Rodriguez-Marino, kind of defines this essential conduct elements test. And I think what the key point is, is the conduct has to be looked at when you're applying 3732. So, for example, the conduct is a sale. So, you know, I'm not taking a definition right now, but the government proffered the idea that maybe the people who are in other districts in Washington, Illinois, Georgia, that might be appropriate there. And it might be, because that might arguably be continuing conduct of the sale from one district into another. But once you realize that the starting point is the essential conduct elements test, and you define something as a circumstance element, I think what Cabrales recognized is circumstance elements can't be used to go from one district to another, because it's the conduct that is started in one district and goes to another, is what gives jurisdiction in multiple jurisdictions. And so circumstance element, no. Conduct element, yes. And I think if the court looks, it'll see there's only one conduct element. Thank you, counsel. The case just argued is well done, is order submitted, and we'll be in recess until we reconvene tomorrow. Thank you, counsel.
judges: Beistline, Trott, Rymer